**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JAMES L. BOLDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 02-2635-KHV** |
| **THE CITY OF TOPEKA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM AND ORDER**

Under 42 U.S.C. § 1983, James L. Bolden brings suit against the City of Topeka, Kansas alleging violation of his right to substantive due process under the Fourteenth Amendment. This matter comes before the Court on a bench trial, which the Court conducted on March 11, 2008. The Court finds that the City is entitled to judgment and makes the following findings of fact and conclusions of law, as required by Rule 52(a)(1) of the Federal Rules of Civil Procedure.

**Findings Of Fact**

Plaintiff challenges the constitutionality of a local ordinance which allowed the City to demolish his uninhabitable properties on a finding that the repair costs of the respective properties exceeded 15 per cent of their replacement value. The Court will first set forth facts concerning the City's adoption of the 15 per cent demolition threshold, then facts concerning the City's regulation of unsafe property in general and the City's demolition of plaintiff's property in particular.

**I.     The City's Adoption Of The 15 Per Cent Demolition Threshold**

In 1955, the Kansas legislature enacted the urban renewal law, K.S.A. § 17-4742 et seq., which authorizes municipalities to adopt ordinances relating to repair and demolition of unsafe structures, see id. § 17-4759. Under the urban renewal law, municipalities are empowered to create

standards for determining whether subject properties are unfit for human use or habitation, see id.

§ 17-4759(c), and to order the repair or demolition of properties found to be unfit, see id. § 17-

4759(b)(3).

As authorized by the urban renewal law, the City adopted an unsafe structures code which

provides generally that

> the city council has found that there exist[] within the corporate limits of the city
> structures which are unfit for human use or habitation due to dilapidation, defects
> increasing the hazard of fires, accidents or other calamities, lack of ventilation, light
> or sanitary facilities or other conditions . . . which render such structures unsafe,
> unsanitary or otherwise inimical to the welfare of the residents of the city, [and] it
> is hereby deemed necessary by the council to require or cause the repair, closing or
> demolition or removal of such structures in the manner provided in this article.

Topeka, Kan., Code art. XI, § 26-546.[1]   The unsafe structures code deems a structure to be

uninhabitable when certain conditions are present, as follows:

> (1)   Whenever the building or structure, or any portion thereof, because of
> (i) dilapidation, deterioration or decay; (ii) faulty construction; (iii) the
> removal, movement or instability of any portion of the ground necessary for
> the purpose of supporting such building; (iv) the deterioration, decay or
> inadequacy of its foundation; or (v) any other cause, is likely to partially or
> completely collapse;
>
> (2)   Whenever any portion thereof has been damaged by fire, tornado, wind, flood
> or by any other cause, to such an extent that the structural strength or stability
> thereof is materially less than it was before such catastrophe and is less than
> the minimum requirements of the building code for new buildings of similar
> structure, purpose or location;
>
> (3)   Whenever any portion or member or appurtenance thereof is likely to fail, or
> to become detached or dislodged, or to collapse and thereby injure persons

---

[1]      In April of 2004, the City council adopted ordinance number 18210, which created
the property maintenance chapter of the City code and redesignated the unsafe structures code as
article IV of that chapter.  See Topeka, Kan., Code art. IV, §§ 112-291-301.  For ease of reference,
the Court cites the unsafe structures code as it existed during the period of time relevant to this case
(i.e., as article XI of chapter 26).

or damage property;

(4)    Dilapidation, disrepair or structural defects;

(5)    Whenever any portion of a building, or any member, appurtenance or ornamentation on the exterior thereof is not of sufficient strength or stability, or is not so anchored, attached or fastened in place so as to be capable of resisting a wind pressure of one half of that specified in the building code for new buildings of similar structure, purpose or location without exceeding the working stresses permitted in the building code for such buildings;

(6)    Defects therein increasing the hazard of fire, accident or other calamities;

(7)    Walls, sidings or exteriors of a quality and appearance not commensurate with the properties in the neighborhood which creates an unsightly appearance and causes a blight to adjoining properties and the neighborhood;

(8)    Failure to meet the minimum housing standards established by chapter 82, article II of the Code of the City of Topeka; or

(9)    Any violation of fire or building or regulations which renders the structure unsafe.

Topeka, Kan., Code art. XI, § 26-550.

The urban renewal law originally instructed municipalities to order repair of uninhabitable properties which could be made habitable "at a reasonable cost in relation to the value of the dwelling," and to order demolition of uninhabitable properties which could not be so repaired. See 1955 Kan. Sess. Laws 207. In 1998, the Kansas legislature amended the urban renewal law to require municipalities to order repair of uninhabitable property if repair can be made "at a reasonable cost in relation to the replacement value of the structure" (as opposed to "the value of the dwelling") and to order demolition if it cannot. 1998 Kan. Sess. Laws 988-89. The urban renewal law requires municipalities to "fix a certain percentage of such cost as being reasonable." K.S.A. § 17-4759(b)(3)(A)-(B).

After the Kansas legislature amended the urban renewal law to require the use of a ratio of

repair cost to replacement value – rather than a ratio of repair cost to appraised value – the City undertook to amend its unsafe structures code to conform to state law.  As part of this process, the City code compliance service prepared for the City council a matrix which detailed the practical affect of various percentages which might be used in the amended code.  The matrix contained a "whole assortment of percentages" which the council members discussed at two work sessions.

On October 27, 1998, the City council held a meeting to determine which percentage it would adopt to decide whether to order repair or demolition of uninhabitable property.  As originally drafted, the amended code proposed a 10 per cent demolition threshold.  At the meeting, the council first considered rasing the threshold to 15 per cent.  The councilman who proposed 15 per cent referenced a list of 39 properties which would be demolished under the 10 per cent threshold and explained that 33 of those properties would survive a 15 per cent threshold.  The councilman concluded that the change to 15 per cent would "increase property rights significantly."  The council voted seven to two in favor of the 15 per cent threshold.[2]

Later in the meeting, the council considered increasing the demolition threshold to 25 per cent.  The councilman who had proposed the 15 per cent threshold argued against the increase. Specifically, he cited a list of 21 uninhabitable properties and explained that the 25 per cent threshold would save only one more property than the 15 per cent threshold.  He argued that a lower demolition threshold would more strongly encourage property owners to maintain their property. The council voted seven to two against the 25 per cent threshold, leaving the 15 per cent threshold

_____

[2]        One councilwoman who voted against the 15 per cent threshold expressed her concern that the threshold was "still too low considering the replacement cost of housing in this day and time."  Another councilman later indicated that he voted in favor of the 15 per cent threshold because "[he] thought 15 percent was better than 10."

in place.  After the council rejected the 25 per cent threshold, then-mayor Joan Wagnon, who presided over the meeting, explained that "the reason this is a tough decision right now is we're the first City to try and bring our ordinance in line with the new state law that's passed and it's been difficult to determine what that equitable percentage is."

Ultimately, the council voted eight to one to adopt the entire amended unsafe structures code, including the 15 per cent demolition threshold.  As amended, the unsafe structures code permitted an administrative hearing officer to order repair or demolition of uninhabitable property as follows:

(a) . . . [I]f the administrative hearing officer determines that the structure . . . is unfit for human use or habitation or otherwise endangers the life, health, property or safety of its inhabitants or the public, the administrative hearing officer . . . shall issue . . . an order which:

> (1)  If repair, alteration or improvement of the structure can be made at a reasonable cost in relation to the value of the structure, which cost shall not exceed 15 percent of the replacement value of such structure as established by the Shawnee County Appraiser, the owner of the structure shall, within the time specified in the order, repair, alter or improve such structure to render it fit for human use or habitation; or

> (2)  If repair, alteration or improvement of the structure cannot be made at a reasonable cost in relation to the replacement value, that is to say, 15 percent or less of the replacement value of such structure, which percentage is hereby deemed to be a reasonable standard by which to require either repair, alteration or improvement, or removal or demolition, the owner shall within the time specified in the order remove or demolish such structure. * * *

Topeka, Kan., Code art. XI, § 26-551.[3]

---

[3]      In 2004, the City increased the 15 per cent demolition threshold to 30 per cent.  See Topeka, Kan., Code art. IV, § 294.  Miriam Berke, City manager of development services, testified that she knows of no unsafe structure which the City could demolish under the 15 per cent threshold but could not demolish under the 30 per cent threshold.

## II.     The City's Regulation Of Unsafe Property

In 1999, the City formed a committee to study the health of its neighborhoods.  As part of the committee's work, City planners drafted a comprehensive metropolitan plan which included a policy framework for sustaining livable neighborhoods through the use of public and private resources.  The City council adopted the plan in July of 2000 and under the plan's framework, began characterizing City neighborhoods as "healthy," "out patient," "at risk" or "intensive care." Intensive care neighborhoods are those in the most serious distress and contain the largest number of vacant and boarded-up houses.[4]  At trial, several City officials testified that vacant houses often have a blighting influence on the surrounding neighborhood and may threaten public safety by creating attractive nuisances for nearby children and harboring criminals, vagrants and wild animals.

The property code enforcement section of the City's department of public works administers the unsafe structures code.  The unsafe structures code establishes a two-step process for addressing potentially unsafe property.  Initially, an administrative hearing officer must determine that the subject property is uninhabitable according to the conditions set forth in Section 26-550.  If the property is deemed uninhabitable, Section 26-551 mandates that the administrative hearing officer order repair or demolition of the property, depending on whether it can be made habitable at a cost not exceeding 15 per cent of its replacement value.  As Miriam Berke, City manager of development services, explained, the 15 per cent demolition threshold becomes applicable only after the City determines that a particular property is in fact uninhabitable.

In determining the cost of repair of an uninhabitable property, the City normally conducts

_____

[4]        At the time they were found uninhabitable and ordered demolished, the properties at issue in this case were located in intensive care neighborhoods.

an exterior inspection.  The exterior inspection saves the City from having to secure permission of the owner or an administrative warrant to complete a more thorough interior inspection.  As a practical matter, an exterior inspection may reveal damage to the roof, siding, windows or foundation which suggests further interior damage.  Given the normal procedure of conducting only exterior inspections of subject properties, Berke testified that 15 per cent is an appropriate demolition threshold because many uninhabitable properties are missing interior components (e.g., plumbing and heating systems) which must be replaced at additional cost before the property becomes building code compliant.  These uncalculated costs often result in actual repair costs which far exceed the 15 per cent threshold.

For those dilapidated properties which the City does not demolish, the City department of housing and neighborhood development administers a block grant program which disburses federal monies to qualifying applicants for purposes of rehabilitating residential property.  Under the block grant program, homeowners may receive up to $35,000 and landlords may receive up to $10,000.  Randy Speaker, deputy City manager, testified that the City considers the reasonableness of the cost of repair as one factor in choosing to award the block grants.  Speaker further testified that the City could conceivably provide a homeowner with $35,000 to rehabilitate a property which had a replacement value of $100,000.

## III.    The Demolition Of Plaintiff's Properties

At a county tax sale on August 29, 2001, plaintiff purchased properties located at 1146 Southwest Washburn and 421 Southwest Tyler in Topeka, Kansas.  Plaintiff paid $1,900 for the Washburn property and $2,600 for the Tyler property.

On August 10, 2001 – before plaintiff purchased the properties – an administrative hearing

officer for the City had issued an order which found that the house on Washburn was unfit for human use or habitation and that repair, alteration or improvement was not possible at a reasonable cost.[5] The administrative hearing officer ordered that the structure be removed or demolished within 30 days.[6]

After plaintiff purchased the Washburn property, he learned that the City intended to demolish it.  On September 18, 2001, plaintiff requested a hearing to appeal the demolition order. After a hearing on October 15, 2001, an administrative hearing officer found that plaintiff had no evidence of ability or plans to rehabilitate the Washburn property, and affirmed the demolition order. In January of 2003, after court proceedings on the matter, the City demolished the house on the Washburn property.

On March 18, 2002, the City held an administrative hearing regarding the Tyler property. On March 26, 2002, an administrative hearing officer issued an order which found that the house was unfit for human use or habitation and that repair, alteration or improvement was not possible at a reasonable cost.[7]  The administrative hearing officer later ordered that the structure be removed or demolished within 30 days.  In February of 2003, after court proceedings on the matter, the City

---

[5]     The City estimated the replacement value of the house on Washburn to be $88,550.00, and the exterior cost of repair to be $17,774.20.  These figures reflect a repair cost of approximately 21 per cent of the replacement value.

[6]     The same day – August 10, 2001 – the City posted notice of the demolition order on the front door of the Washburn property.  Before plaintiff purchased that property on August 29, 2001, he inspected the exterior of the property and observed the notice, but did not read it.  Plaintiff testified that he was not concerned with the contents of the notice because county officials had told him that the property could be repaired.

[7]     The City estimated the replacement value of the house on Tyler to be $154,570.00, and the cost of repair to be $36,995.87.  These figures reflect a repair cost of approximately 24 per cent of the replacement value.

demolished the house on Tyler.

The administrative hearing officers entered the demolition orders of August 10, 2001 and March 26, 2002 pursuant to the City unsafe structures code. Plaintiff challenges the constitutionality of the code under the substantive due process clause of the Fourteenth Amendment. Specifically, plaintiff argues that the 15 per cent demolition threshold is not rationally related to any legitimate government interest.

## Conclusions Of Law

Substantive due process protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them. Daniels v. Williams, 474 U.S. 327, 331 (1986); see also Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs., 936 F.2d 483, 490 (1991) (substantive due process guarantees that state will not arbitrarily deprive person of life, liberty or property regardless of how fair procedures are that are used to make decision). Because the Supreme Court has always been reluctant to expand the concept of substantive due process, such claims are subject to heightened standards. Rector v. City and County of Denver, 348 F.3d 935, 948 (10th Cir. 2003) (citing County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)).

When local regulations are challenged on substantive due process grounds, "courts consistently defer to legislative determinations as to the desirability of particular statutory schemes." Okla. Educ. Ass'n v. Alcoholic Beverage Laws Enforcement Comm'n, 889 F.2d 929, 935 (10th Cir. 1989). Unless the challenged law trammels fundamental personal rights, the Court presumes that the legislative body acted within its constitutional power and requires "only that the law bears a

reasonable relation to the state's legitimate purpose."[8]  Id.  Where any conceivable legitimate

governmental interest supports the contested ordinance, it is not arbitrary and capricious and cannot

offend substantive due process norms.  Universal Life Church v. Utah, 189 F. Supp.2d 1302, 1314-

15 (D. Utah 2002) (citing Sam & Ali, Inc. v. Ohio Dep't of Liquor Control, 158 F.3d 397, 402 (6th

Cir. 1998)).  When exercising rational basis review, the Court is obligated to seek out any possible

reason for validating the challenged law.  Powers v. Harris, 379 F.3d 1208, 1217 (10th Cir. 2004).

Plaintiff concedes that the City has a legitimate interest in protecting the public from unsafe

structures.  See Harris v. City of Wichita, 74 F.3d 1249 (Table), 1996 WL 7963, at *5 (10th Cir.

Jan. 3, 1996) (in interest of general public welfare, governments have wide latitude to regulate

private property in ways that may adversely affect property owners); Jones v. Wildgen, 320

F. Supp.2d 1116, 1128 (D. Kan. 2004) (policies which promote safe housing serve government

interest in public health and welfare).  Plaintiff's substantive due process claim is premised on the

argument that the 15 per cent demolition threshold in Section 26-551 of the City unsafe structures

---

[8]      In contrast, where a substantive due process claim alleges the deprivation of a
fundamental right, the Court must determine whether the challenged legislation is narrowly tailored
to serve a compelling government interest.  Lawrence v. Texas, 539 U.S. 558, 593 (2003).
Fundamental rights are those which, objectively, are deeply rooted in the nation's history and
tradition, and are implicit within the concept of ordered liberty, Washington v. Glucksberg, 521 U.S.
702, 720-21 (1997), including rights related to marriage, family, procreation and bodily integrity,
Hughes v. Keath, 328 F. Supp.2d 1161, 1165-66 (D. Kan. 2004).  Here, plaintiff does not argue that
he asserts a fundamental right.  Indeed, because property rights are created by independent sources
such as state law, rather than the Constitution, such rights do not necessarily constitute fundamental
rights.  See Archuleta, 936 F.2d at 489 n.6 (discussing without deciding whether property rights
derived from state law are fundamental); Highland Dev., Inc. v. Duchesne County, No. 203-CV-750
TC, 2007 WL 702237, at *23 (D. Utah Mar. 2, 2007) (citing Greenbriar Vill., L.L.C. v. Mountain
Brook, City, 345 F.3d 1258, 1262 (11th Cir. 2003)) (denial of state granted property right does not
create viable substantive due process claim).  Because plaintiff does not argue the deprivation of a
fundamental right, the Court applies the rational basis test to his claim.

code was not rationally related to that legitimate government interest.[9]  Specifically, plaintiff argues that the 15 per cent demolition threshold was irrational because (1) the City presented no evidence of rationality, (2) the City could equally protect health and public safety with a 30 per cent demolition threshold (which is the threshold that the City currently uses), and (3) the City grants rehabilitation loans to owners whose property cannot be repaired at less than 15 per cent of replacement value.

Plaintiff's contention that the City must present evidence of rationality misconstrues the burden of proof in this case.  Under rational basis review, the government "has no obligation to produce evidence to sustain the rationality of a statutory classification."  Heller v. Doe ex rel. Doe, 509 U.S. 312, 320 (1993).  The challenged ordinance is presumed constitutional and plaintiff bears the burden of negating "every conceivable basis which might support it."  Id.  As a matter of law, plaintiff has not carried this burden.

Although the City need not present evidence of a rational basis for the 15 per cent demolition threshold, the Court finds that it has in fact done so.  In determining the rationality of a challenged statute, the Court may consider the legislative history underlying the statute.  See United States v. Potts, 347 F.3d 873, 880 (10th Cir. 2003) (recognizing legislative history as source which illustrates rational link between DNA Act and government's interest in enforcing criminal law); Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d 1451, 1455 (10th Cir. 1993) (noting that legislative record

---

[9]  Plaintiff does not take issue with the general framework of the unsafe structures code, which closely tracks the Kansas urban renewal law.  Specifically, plaintiff does not challenge the notion that the City may deem certain properties uninhabitable and utilize a percentage cost of repair to decide whether to order repair or demolition of those properties.  Also, plaintiff does not take issue with the determinations that the Washburn and Tyler properties were uninhabitable when the administrative hearing officers ordered that they be demolished.

provides rational basis for certain provisions of Fair Housing Act).  Here, the record contains evidence that the City council considered several possible percentages – both formally and informally – before adopting the 15 per cent demolition threshold.  The transcript of the City council meeting in October of 1998 reflects that the council specifically considered percentages both higher (25 per cent) and lower (10 per cent) than 15 per cent.  Given the arguments advanced by the council members, the record suggests that the council found 15 per cent to be an appropriate demolition threshold because that percentage afforded significantly more property rights to home owners than the 10 per cent threshold and created more motivation to maintain habitable property than the 25 per cent threshold – a threshold which would not have significantly increased property rights.  On rational basis review, the Court is in no position to question these findings.  See Powers, 379 F.3d at 1217 (second-guessing of legislative judgment not allowed on rational basis review).  Considering the council's apparent intent to effectively regulate uninhabitable property while preserving a meaningful degree of property rights, the record does not support plaintiff's claim that the 15 per cent demolition threshold is arbitrary and capricious.

As further evidence of the rationality of the 15 per cent demolition threshold, the record suggests that the threshold compliments the City's normal enforcement of the unsafe structures code.  The Court may find rationality in provisions which improve the efficiency of government enforcement of laws that promote public welfare.  See United States v. Croxford, 170 Fed. Appx. 31, 41 (10th Cir. 2006) (given enforcement difficulty in distinguishing between intrastate and interstate child pornography, Congress had rational basis for regulating both); Dodger's Bar & Grill v. Johnson County Bd. of Comm'rs, 889 F. Supp. 1431, 1436 (D. Kan. 1995) (concern over implementation of general regulatory scheme creates rational basis for enforcement provisions of

that scheme), aff'd, 98 F.3d 1262 (10th Cir. 1996).  Here, enforcement of the unsafe structures code relies primarily on exterior inspections of subject properties.  Such inspections promote efficiency in enforcement of the code and are sufficient to distinguish between those properties that can be repaired and those that cannot.[10]  Presumably, a higher demolition threshold would alter this enforcement scheme by making it necessary for City inspectors to conduct interior inspections of subject properties.  From this perspective, the 15 per cent demolition threshold serves as a rational mechanism for efficient enforcement of the unsafe structures code, which in turn promotes public health and safety.  On these bases, the Court finds that the 15 per cent demolition threshold contained in Section 26-551 of the City unsafe structures code is rationally related to the City's legitimate interest in protecting the public from the dangers of unsafe structures.

Plaintiff's contention that the 15 per cent threshold is irrational because a 30 per cent threshold would be equally effective in protecting public safety is essentially an argument that the City must use the least restrictive means to promote its legitimate interest.  This argument is misplaced.  "[R]ational basis review does not give courts the option to speculate as to whether some other scheme could have better regulated the evils in question," Powers, 379 F.3d at 1217, and the Court does not consider the desirability of a 30 per cent demolition threshold.  Even if the 15 per cent threshold is lower than necessary to protect against unsafe structures, rational basis review does not demand a perfect fit between means and ends, and the ordinance is not unconstitutional simply

---

[10]    As a practical matter, repair costs which exceed 15 per cent of a property's replacement value on the exterior alone would typically be much greater once interior repairs are also included.  As noted above, most vacant properties require costly interior repairs as a matter of course.  Exterior inspections are also able to identify certain defects which suggest further interior damage.  Even if the Court were more troubled by the 15 per cent demolition threshold, the application of that threshold in conjunction with the City's normal enforcement scheme creates an effective demolition threshold which is greater than 15 per cent.

because it "is not made with mathematical nicety or because in practice it results in some inequality." Heller, 509 U.S. at 321. The Court also rejects any implication that the City's current threshold (30 per cent) demonstrates the irrationality of the 15 per cent threshold. In Powers, the Tenth Circuit explained that "[a]s a creature of politics, the definition of the public good changes with the political winds." Id. at 1218. Given the inherent fluidity of the law-making process, the Court will not play one version of the unsafe structures code against another.

The Court is also unpersuaded by plaintiff's contention that the City block grant program demonstrates the irrationality of the 15 per cent demolition threshold. Although the record includes testimony that the City can award rehabilitation grants to homeowners who cannot repair their property at a cost less than 15 per cent of the property's replacement value, the record does not suggest that the properties which receive these grants are also properties which the City would deem uninhabitable under the unsafe structures code such that the City would then apply the 15 per cent demolition threshold. In other words, the distribution of rehabilitation grants is not necessarily inconsistent with the application of the 15 per cent demolition threshold. Moreover, any tension which exists between the block grant program and the unsafe structures code does not automatically call into question the 15 per cent demolition threshold. Because the block grant program and the unsafe structures code are administered independently, their differences may be attributed to the unique demands of the separate departments which enforce them – rather than some irrationality in one regulation or the other.

For plaintiff to prevail on his substantive due process claim, the Court must find that no state of facts either known or reasonably assumed affords support for the ordinance. See Powers, 379 F.3d at 1216-17 (citing United States v. Carolene Prods. Co., 304 U.S. 144, 154 (1938)). On this

record, the Court finds that plaintiff has not dispelled all rational explanations for the 15 per cent

demolition threshold contained in Section 26-551 of the City unsafe structures code.  Specifically,

the City council's effort to balance the need for regulation of unsafe properties with the rights of

private property owners suggests that their adoption of the 15 per cent threshold was not arbitrary

and capricious.  The consistency of the 15 per cent figure with the City's enforcement scheme

further validates the demolition threshold.

**IT IS THEREFORE ORDERED** that plaintiff take nothing on his claim against defendant.

The Clerk of the Court is hereby ordered to enter judgment in favor of defendant in this matter.

Dated this 28th day of April, 2008 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge